## RUESCH INTERNATIONAL MONETARY SERVICES, INC., et al., Appellants,

v.

## Dianne M. FARRINGTON, et al., Appellees.

### No. 98–CV–182.

District of Columbia Court of Appeals.

Argued Feb. 2, 2000.
Decided June 15, 2000.

---

7. The trial court found a "persistent course of conduct" to exist for other reasons. See *su-* *pra* note 5.

Lester B. Seidel, with whom Jeffrey M. Mervis, Bethesda, MD, was on the brief, for appellants.

Dianne M. Farrington, pro se.

James M. Towarnicky, Springfield, VA, filed a brief for appellee Anne T. Taylor.

Before RUIZ and WASHINGTON, Associate Judges, and KERN, Senior Judge.

KERN, Senior Judge:

This is an appeal from the trial court's denial of a motion by appellants seeking to have sanctions imposed pursuant to Super. Ct. Civ. R. 11 against appellee Farrington and various attorneys who represented her in the filing of a complaint. The sanctions motion alleged that the complaint was filed "for an improper purpose," without making "a reasonable inquiry [that] would have shown that the legal claims are unmeritorious (sic) and not warranted" and the complaint "lacked factual and evidentiary support for [the] allegations." We remand the case for further proceedings consistent with this opinion.

The record reflects that in May 1997, a complaint was filed in the trial court by appellee Farrington, represented by an attorney who signed the complaint. The gravamen of this complaint was that in 1983, appellee, a Certified Public Accountant, active in real estate investment and the Secretary and Treasurer of the New Venture Capital Corporation, orally agreed to give and did give to Ruesch International Monetary Services, Inc. (RIMS), a foreign exchange company, $98,000 in consideration of receiving shares of stock in RIMS. The complaint further alleged that "[b]ecause of the rush and urgency ... it was agreed that the issuance of the promised shares would be deferred until a later time." The complaint also alleged that appellee Farrington "for the first time on May 18, 1994 (emphasis added), learned ... that the company (RIMS) absolutely

refused to issue the shares which had been promised to her...."[1]

Appellants thereafter filed three motions: a Motion to Dismiss and/or for Summary Judgment; a Motion to Dismiss and Disqualify Counsel; and, a Motion for Sanctions Pursuant to Rule 11. These motions variously alleged that the Statute of Limitations barred the complaint, *see Cunningham v. Bathon,* 719 A.2d 497, 500 (D.C.1998) (holding that plaintiff was a sophisticated and knowledgeable investor who failed to present any evidence to justify the alleged tolling of the statute of limitations); that enforcement of the alleged oral agreement was barred by the Statute of Frauds in view of its failure to state the kind of shares of stock, the number of shares of stock, and the date of conveyance of the shares of stock, *see Fitzgerald v. Hunter Concessions, Inc.,* 710 A.2d 863, 865 (D.C.1998) (holding that contract incapable of being performed within one year must be in writing); and, that the firm of attorneys representing the complainant had a conflict of interest because one of its partners had been an officer of RIMS at the time of the alleged oral agreement between RIMS and appellee Farrington and, therefore, should be disqualified from representing appellee. *See District of Columbia Rules of Professional Conduct Rule 1.7 and 1.9.*

The conscientious trial judge held an initial scheduling conference on September 5, 1997, at which she announced that she had reviewed "the ample written pleadings" and would address several pending motions "as a preliminary matter in order to determine whether we need to proceed." The trial court then invited comment from both appellee, who was then proceeding *pro se,* as well as from counsel for appellants. Counsel, referring to his motion to dismiss, asserted that "giving the plaintiff [Farrington] every benefit of the doubt, it is clear that they knew of the claim [for the $98,000] at the latest, November 1992 and I think the undisputed facts demonstrate earlier." Appellee then explained to the court "that the first time that I became aware that they were fraudulently not going to issue my shares was when I had been reassured that they were going to, [and] they then, therefore didn't...." However, appellee seemed to agree with the trial court's statement that she appeared to have been given such reassurance at a Board of Directors Meeting "back in 89."[2]

The court, after hearing such argument, ruled that the attorney who represented appellee at the time appellant filed its Motion to Disqualify should be disqualified. As to the statute of limitations argument by appellants, the court stated that it "has carefully considered plaintiff's arguments that when she really knew that defendants had no intention of providing her with the stock shares ... was not until May of 1994 and that the claim therefore did not occur until that time, and the court is not compelled by that." The court went on to find that "no lulling" of appellee "to

---

1. Appellee/Plaintiff's complaint states, "On or about May 18, 1994, and at all times thereafter, the Defendants refused to provide Plaintiff Farrington possession of the shares due her and held for her. Defendants offered no explanation, and in fact had no legal right or justification for withholding the shares Plaintiff was entitled to." Further, the complaint states, "Defendants, however, have failed and refused to convey to Plaintiff Farrington the shares in accordance with the terms of the contract."

2. During this hearing, a conversation took place regarding the period of time when appellee first became aware that fraudulent representations were made to her by appellant. The court asked appellee, "When were the fraudulent misrepresentations made to you that caused you to believe—?" and appellee responded, "When I was given reassurance by them that they were." The court then proceeded to ask, "And that was when?" to which appellee responded, "At the Board of Directors meetings when my husband spoke to Jeanie (sic) Weaver." In response the court said, "Okay. Would that have been back in '89 when your husband was in, filling his role with the corporation?," and appellee said, "Um-hum."

[have been] shown here." The court concluded that "the dismissal of the plaintiff's claim ... is the only appropriate legal action to take given the very unusual facts and circumstances of this matter. I find it to be called for by the statute of limitations and the statute of frauds...." Accordingly, the trial court granted appellants' motion for summary judgment and to dismiss. However, the trial court deferred action on the motion for sanctions.

Appellant's Rule 11 motion for sanctions and supporting documents alleged in essence as follows: (1) that appellee Farrington and her attorneys (including her husband's law firm) filed her complaint "for an improper purpose—to harass and increase litigation and attempt to extort some type of monetary settlement," (2) that the complaint lacked "factual and evidentiary support for allegations [and lacked] reasonable inquiry," and (3) the unreasonable filing of the complaint justified exercise of the trial court's "inherent authority to punish bad faith and abusive litigation tactics, and to prevent, deter and punish frauds on the court and sham litigation."

In January 1998, the trial court issued a terse, two-page order denying appellant's motion for sanctions "for bad faith and abusive litigation tactics" pursuant to Rule 11. The court stated that the "defendants [appellants] have not met their burden of proving, in this complicated investment matter, plaintiff's [appellee] entire legal action was brought solely to harass the defendants, or that plaintiff's lawsuit was otherwise so frivolous as to justify the imposition of sanctions." *See Green v. Louis Fireison & Assocs.*, 618 A.2d 185, 188–89 (D.C.1992) (holding that Rule 11 is not violated solely because a pleading is not warranted by existing law). The court concluded that "allegedly improper actions by plaintiff's counsel could be more properly addressed by D.C. Bar Counsel [rath-

er] than by the court in a Rule 11 judicial proceeding." [3]

We recognize that in applying Rule 11 we are required "to balance the potential 'chill' on innovative theories of law against the need to discourage frivolous or dilatory litigation." *Cooper v. AFSCME, Local 1033*, 656 A.2d 1141, 1145 (D.C.1995) (*quoting Williams v. Board of Trustees of Mount Jezreel Baptist Church*, 589 A.2d 901, 911 (D.C.1991)). We further recognize that "Rule 11 is violated only when it is 'patently clear that a claim has absolutely no chance of success.'" *Gray v. Washington*, 612 A.2d 839, 842 (D.C.1992) (*quoting Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir.1986) (quotation omitted)). This court applies an abuse of discretion standard in reviewing the decision to grant or deny a motion for sanctions. *See Kennedy v. District of Columbia*, 654 A.2d 847, 859 (D.C.1994) (stating that trial court's decision to grant or deny a motion for sanctions is reviewed for abuse of discretion). In the past this court has interpreted Rule 11 when determining whether sanctions should be imposed. *Cunningham, supra* (holding that this court must allow wide discretion to a trial court's determination that sanctions are warranted); *Bredehoft, supra* note 3, 686 A.2d at 593; *Montgomery v. Jimmy's Tire & Auto Center, Inc.*, 566 A.2d 1025, 1028–29 (D.C. 1989).

The Rule 11 sanction motion attachments contain excerpts from the oral deposition taken in March 1996 of a proceeding involving New Venture Capital Corporation in which appellee was Secretary and Treasurer, and her husband, Lewis Rivlin, Esquire, the President. In such deposition, the President of New Venture described his corporation as "unfunded—it's a shell waiting to happen." He further stated: "We're going to file a lawsuit against Ruesch ... we were waiting deliberately for the last minute because we

---

**3.** The trial court did not address the part of appellant's motion asking the court to exercise its "inherent authority to punish bad faith and abusive litigation tactics." *See Bredehoft v. Alexander*, 686 A.2d 586, 589 (D.C.1996).

knew that Otto Ruesch should feel that he was home safe at some point." In response to an inquiry, "What entity holds the cause of action?" the New Venture President replied: "That's the problem. I have to resuscitate the old New Venture Capital Corporation by bringing it up to date in the state of Delaware." He also testified in his deposition that "we're going to be filing suit in this within probably the next 14 days," and "I can work out all kinds of agreements with Otto Ruesch. He's going to want to settle." The deponent further stated: "If we do get a significant amount of money, then Mr. Lowe and all others who are creditors ... will get a significant dividend at least, because if this settles, I don't know that we'll get much more than a million bucks, but I know if we litigate it through to the end, we could make a very strong argument for $7 million...."

In July 1996, Mr. Rivlin testified in further depositions that although the complaint against appellants "was not yet filed" it was "virtually ready to file." He opined that RIMS and its holding company have "huge" assets, and that he anticipated RIMS would settle his lawsuit rather quickly. He acknowledged that although he personally had no cause of action against RIMS, the legal action of his wife, appellee Farrington, "would put money in his pockets" because he would receive "a share of the settlement" as attorney's fees.

Appellants further submitted in support of their sanction motion an affidavit by one of the appellants who was an officer of RIMS. She asserted under oath that appellee's husband "was at all times relevant to the allegations of the complaint ...

corporate counsel to RIMS and Vice Chairman of the RIMS board of directors." The affidavit proceeded to state that appellee's husband provided "legal advice and strategic business services, from the inception of RIMS in the early 1980s until some time between 1989 and the early 1990's when he ceased his participation and was replaced on the RIMS board of directors."

Appellee's *pro se* opposition to the Motion for Sanction asserts that she knew that her husband was raising capital for defendant's business [appellant RIMS]. She stated that she was asked to "make a loan with the Mercantile Bank & Trust Co., Baltimore, for $98,000 and he [appellant Ruesch] would provide me an equity kicker, i.e., shares of RIMS stock." She asserted that she "loaned defendants $98,000 but was not giving (sic) the share certificate." Appellee further stated in her opposition to the sanctions motion that although she "routinely questioned" her husband "about the status of my shares" it was not until May 18, 1994 that she "became aware the defendants had no intent on issuing me the share certificates or giving my (sic) the stock as agreed in 1983."

■ The record in the instant case raises in our view serious factual issues that should be resolved by the trial court—on remand—after appropriate notice and hearing. First, given the special access appellee's husband had to RIMS, not only at the time she made her loan to RIMS in 1983, but for years thereafter, given appellee's own business sophistication,[4] given appellee's failure even to mention this loan when she filed bankruptcy proceedings in

---

4. As explained in *Cunningham, supra,* when determining sanctions it is important to look at the status of all parties involved, including the attorneys, taking into account their experience and education. This court in *Cunningham* concluded that the plaintiff was a "sophisticated and knowledgeable investor." Ruling that sanctions were warranted, the court stated, "The delay in filing suit here was extraordinary. Plaintiff advanced no plausi-

ble basis why he did not have sufficient facts available to him to have brought suit substantially earlier within the period of the applicable statute of limitations provisions." *Id.* at 500. Similarly, in the instant matter, appellee is an experienced business person and C.P.A. who failed to demonstrate a reasonable basis for filing her complaint beyond the period provided in the statute of limitations.

1990, and given the trial court's finding that she had **not** been lulled into delaying enforcement of her alleged oral agreement, there is at least a prima facie showing that her complaint in 1997 was frivolous and that her assertion in such complaint that she did not know until 1994 that she would not be repaid was materially false.

■ In addition, given the statements by appellee's husband in depositions of the litigation involving New Venture Capital Corporation that he anticipated obtaining funds by forcing a settlement with RIMS and given appellee's initiation of a complaint against RIMS not too long thereafter, it would appear to be a prima facie showing of a violation of Rule 11 warranting sanctions.[5] The record in our view is sufficient to require the trial court to render findings of fact and conclusions of law in resolving the motion for sanctions. If a violation of Rule 11 is found, sanctions must be imposed. *See Cunningham, supra*, 719 A.2d at 502. The participation of each of the players in this matter—Dianne Farrington; her husband Lewis Rivlin,

Esquire; the law firm of Rivlin & Taylor, L.L.P.; and Robert Scott Harrison (individually and as P.C.)—and their amenability to sanctions, needs to be addressed. *See Cunningham, supra*, 719 A.2d at 502. Further, when determining whether sanctions are appropriate, the court needs to consider the safe harbor provisions of Rule 11. See Super. Ct. Civ. R. 11(c)(1) (stating that in order to be protected by safe harbor provision must withdraw or correct "the challenged paper, claim, defense, contention, allegation, or denial" within 21 days after service of the motion). Accordingly, we remand the case for further proceedings to consider whether sanctions are appropriate under Rule 11 or for abusive or bad faith litigation.

*So ordered.*

---

**5.** A footnote in the trial court's order denying defendant's motion for sanctions states, "While the excerpts from plaintiff's husband's (Lewis Rivlin) deposition cited in defendants' motion certainly strongly suggest an improper harassment motive on his part, the court cannot find that such deposition puffery by Mr. Rivlin establishes the actual motive behind the plaintiff's lawsuit." On remand, the trial court should reconsider its view about the seriousness of Rivlin's comments at his deposition in light of all the evidence.