# District of Columbia
# Court of Appeals

**No. 14-CV-939**

ROSANNE L. WOODROOF,

Appellant,

v.

JOSEPH F. CUNNINGHAM, *et al.*,

Appellees;

**No. 14-CV-1426**

ROSANNE L. WOODROOF,

Appellant,

v.

CUNNINGHAM & ASSOCIATES, PLC,

Appellee;

**No. 14-CV-1441**

CUNNINGHAM & ASSOCIATES, PLC,

Appellant,

v.

ROSANNE L. WOODROOF,

Appellee.



**CAM-6474-13 &**
**CAF-9591-12**

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE:   FISHER and BLACKBURNE-RIGSBY, *Associate Judges*; and NEBEKER,
*Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed,
and was argued by counsel.  On consideration whereof, and as set forth in the opinion
filed this date, it is now hereby

ORDERED and ADJUDGED that the order and judgment of the Superior Court are affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: October 13, 2016.

Opinion by Associate Judge John Fisher.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-939

ROSANNE L. WOODROOF, APPELLANT,

v.

JOSEPH F. CUNNINGHAM, *et al.*, APPELLEES,

No. 14-CV-1426

ROSANNE L. WOODROOF, APPELLANT,

v.

CUNNINGHAM & ASSOCIATES, PLC, APPELLEE,

and

NO. 14-CV-1441

CUNNINGHAM & ASSOCIATES, PLC, APPELLANT,

v.

ROSANNE L. WOODROOF, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CAM-6474-13 and CAF-9591-12)

(Hon. Brian F. Holeman, Trial Judge)

(Argued May 10, 2016                           Decided October 13, 2016)

FILED 10/13/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Rosanne L. Woodroof, *pro se*.

*J. Jonathan Schraub*, with whom *Sarah A. Bucovetsky* was on the brief, for appellees in Appeal No. 14-CV-939.

*Joseph F. Cunningham* for appellees/cross-appellants in Appeal Nos. 14-CV-1426 and 14-CV-1441.

*Adam Raviv* and *Lauren N. Moore* were on the brief for amicus curiae The Attorney/Client Arbitration Board of the District of Columbia Bar in response to the court's April 20, 2015, order for the purpose of contesting the appealability of the Superior Court order compelling arbitration.

Before FISHER and BLACKBURNE-RIGSBY, *Associate Judges*, and NEBEKER, *Senior Judge*.

FISHER, *Associate Judge*: Two sets of proceedings underlie these three consolidated appeals: (1) a malpractice claim filed by Rosanne L. Woodroof against her former attorney Joseph F. Cunningham and his law firm Cunningham & Associates, PLC (collectively "Cunningham"), and (2) proceedings to enforce a foreign judgment for unpaid attorney's fees that Cunningham obtained against Woodroof in Virginia. The primary issue before this court is whether we have jurisdiction to hear Woodroof's appeal from the trial court's order staying the malpractice proceedings and compelling arbitration. We hold that we do have jurisdiction of that appeal; our jurisdiction of the appeals related to the foreign judgment proceedings is not questioned. We affirm the challenged order and the judgment of the Superior Court.

## I.      The Malpractice Claim

In December 2008, Woodroof retained Cunningham to represent her in a lawsuit pending in the District of Columbia against the St. George Condominium Association ("Condo Association").   That same day, Woodroof signed an Arbitration Agreement (attached to the Retainer Agreement), which specified that "any dispute as to legal malpractice . . . will be determined by submission to arbitration as provided by District of Columbia law[.]"  In 2010, Woodroof, "with Mr. Cunningham's involvement," settled the damages suit against the Condo Association for $160,000.  At this time, Woodroof asserted, she had incurred over $250,000 in attorney's fees.  She refused to pay the full amount, contending that "[t]he ballooning costs were in large part due to Cunningham's failure to pursue the lawsuit with the expected diligence and zeal."  The litigation over attorney's fees, which occurred in Virginia, is discussed later in this opinion.

Woodroof filed a malpractice complaint against Cunningham on September 24, 2013.   On July 9, 2014, Judge Brian F. Holeman granted Cunningham's motion to stay the malpractice proceedings and ordered the parties to "submit the . . . [malpractice action] to binding arbitration, pursuant to the terms of the Retainer Agreement and the Arbitration Agreement entered between the

parties." Woodroof appealed and argues that there is no enforceable agreement to arbitrate. Cunningham challenges our jurisdiction to consider the issue but argues, in the alternative, that the agreement to arbitrate is valid and enforceable.

## A. Appellate Jurisdiction

Although the District of Columbia Revised Uniform Arbitration Act ("RUAA") provides that "[a]n appeal may be taken from . . . [a]n order denying or *granting* a motion to compel arbitration," D.C. Code § 16-4427 (a)(1) (2012 Repl.) (emphasis added), Cunningham argues that Woodroof cannot appeal Judge Holeman's order. He asserts that, by making such orders appealable, the Council of the District of Columbia violated the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. 93-198, 87 Stat. 774 (1973) ("the Home Rule Act") by attempting to expand our jurisdiction. We reject Cunningham's argument.

## 1. Background

The Home Rule Act specifies that the Council "shall have no authority to . . . [e]nact any act, resolution, or rule with respect to any provision of Title 11

(relating to organization and jurisdiction of the District of Columbia courts.)" D.C. Code § 1-206.02 (a)(4) (2012 Repl.). Among other things, Title 11 gives us jurisdiction over "appeals from . . . all final orders and judgments . . . [and certain] interlocutory orders of the Superior Court of the District of Columbia," including those "granting, continuing, modifying, refusing, or dissolving or refusing to dissolve or modify injunctions." D.C. Code § 11-721 (a) (2012 Repl.). As a matter of precedent, an order denying a motion to arbitrate is an appealable order under Title 11, but an order granting a motion to arbitrate is not. *See, e.g.*, *Brandon v. Hines*, 439 A.2d 496, 507 (D.C. 1981) ("[O]nly an order denying—not granting—a stay of litigation pending arbitration is appealable."); *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 38-39 (D.C. 1989) (adopting *Brandon*'s distinction between orders denying and granting a stay pending arbitration).

Woodroof points out that we recently articulated a narrow exception to this rule in *Andrew v. Am. Imp. Ctr.*, 110 A.3d 626 (D.C. 2015). There we held that an order compelling arbitration *was* "appealable as an interlocutory order under § 11-721 . . . where arbitration was entered into with a commercial entity by way of an adhesion contract." *Id*. at 633-34. However, for reasons explained below, the contract at issue here is not a contract of adhesion, and Woodroof cannot rely on *Andrew* to establish our jurisdiction. Instead, we must squarely face the question

of whether the provision of the RUAA permitting appeals from an order "granting a motion to compel arbitration" violates the Home Rule Act's prohibition on enacting legislation "with respect to" Title 11.

Previously, we avoided this question. In *Parker v. K & L Gates, LLP*, for example, we did not need to address the Home Rule Act issue because, unlike this case, the motion to compel arbitration was "filed and decided in an independent proceeding," 76 A.3d 859, 864 n.3 (D.C. 2013), where arbitrability was the "sole issue before the court." *Id.* (quoting *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 87 (2000)). The order "left no part of [the case] pending before the court," *id.* at 864 (quoting *Green Tree*, 531 U.S. at 86-89), and was therefore "final and appealable under both Title 11 and the RUAA." *Id.* at 864. *See also Andrew*, 110 A.3d at 636 (reserving judgment as to "whether § 16-4427 as applied in other contexts might violate . . . the Home Rule Act"); *BiotechPharma, LLC v. Ludwig & Robinson, PLLC*, 98 A.3d 986, 989 (D.C. 2014) (holding that, as applicable there, the RUAA did not violate the Home Rule Act because Title 11 already "gives this court jurisdiction" over "orders *denying* motions to compel arbitration" (emphasis added)).

In 2010, we addressed for the first time whether the Council had exceeded its authority by adopting the portion of the RUAA which authorizes an appeal from an order granting a motion to compel arbitration. *See Stuart v. Walker*, 6 A.3d 1215, 1219 (D.C. 2010) (holding that "the attempt by the D.C. Council to modify the definitional parameters of finality . . . is . . . beyond its authority"). However, we subsequently vacated that opinion, *see Stuart v. Walker*, 30 A.3d 783 (D.C. 2011) (en banc) (granting petitions for rehearing en banc), and, sitting en banc, we were equally divided "regarding the issue of jurisdiction." *Stuart v. Walker*, No. 09-CV-900 (D.C. Feb. 16, 2012) (en banc) (unpublished judgment). We now set out once more to answer the question of whether D.C. Code § 16-4427 (a)(1) "violates the District of Columbia Home Rule Act by expanding this court's jurisdiction." *Stuart v. Walker*, 6 A.3d at 1219 (Steadman, J., dissenting).[1]

We conclude that D.C. Code § 16-4427 (a)(1) does not violate the Home Rule Act. Our cases have not construed D.C. Code § 1-206.02 (a)(4) rigidly, but instead have recognized that the Council may make substantive changes to the law, even when those changes affect the kinds of cases that the courts adjudicate.

---

[1] In this opinion we will often cite Judge Steadman's dissent for its persuasive analysis. Although both the majority opinion and the dissent in *Stuart v. Walker* have been vacated, they still may be found by using the citations given above.

Indeed, our decisions addressing whether orders denying or granting motions to compel arbitration are appealable have attempted to respect the intent of the Council as expressed in the "overarching statutory scheme" regulating arbitration. *Stuart*, 6 A.3d at 1223. Although the Council now has changed the law by allowing appeals from orders granting motions to compel arbitration, applying that legislation does not threaten the independence of the judiciary or undermine the purposes of the Home Rule Act. We emphasize that, in enacting the RUAA, the Council has not attempted to amend D.C. Code § 11-721 itself.

## 2. The Legislature May Change the Law

Although the RUAA may conflict with our past interpretations of what constitutes an appealable order in this context, there is nothing unusual about the proposition that the legislature may change the law and, by doing so, essentially overrule court decisions.[2] *See Day v. United States*, 682 A.2d 1125, 1129 (D.C. 1996) (recognizing that the legislature can pass statutes that displace or "supersede[] the common law"); *see also Carl v. Children's Hosp.*, 702 A.2d 159,

---

[2] This decision does not violate the bedrock principle that "no division of this court will overrule a prior decision of this court." *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (footnote omitted). We simply are recognizing the power of the legislature to change decisional law.

173 (D.C. 1997) (en banc) (concurring opinion of Ferren, J.) ("[I]f the courts move too far into an area the legislature wants for itself, or even if the legislature merely dislikes what the courts do in a substantive area the legislature has never touched, the legislature can erase a judge-made law.").

Judge Ferren's concurring opinion in *Carl* pointed out instances where the Council had shown it could "override, sometimes swiftly, any statutory interpretation not to its liking." *Id.* at 173 & n.56. *See, e.g.*, D.C. Code § 16-705 (c) (1997) (authorizing eleven-juror verdicts in criminal cases in certain situations, effectively overruling our decision in *Flemming v. United States*, 546 A.2d 1001 (D.C. 1988)); D.C. Code § 16-710 (a) (1997) (authorizing "split sentences" contrary to our holding in *Davis v. United States*, 397 A.2d 951 (D.C. 1979)). *See also* 18 U.S.C. § 3731 (2012) (conferring authority on federal courts of appeals to hear an appeal from a "decision or order of a district court suppressing or excluding evidence" after 28 U.S.C. § 1291 (jurisdiction of appeals from all final decisions) was held insufficient to sustain jurisdiction).

Therefore, the fact that a portion of the RUAA may conflict with our past understanding of jurisdictional boundaries is not by itself problematic. The key question is whether that legislation violated the Home Rule Act.

### 3. Legislative History of the Home Rule Act

"Congress . . . passed the Home Rule Act, D.C. Code § 1-201.01 *et seq.* (2012 Repl.), with the intent of giving the Council of the District of Columbia broad authority to legislate upon 'all rightful subjects of legislation within the District.'" *Andrew*, 110 A.3d at 628 (quoting D.C. Code § 1-203.02 (2012 Repl.)). However, Congress reserved "the right, at any time, to exercise its constitutional authority as legislature for the District." *See* D.C. Code § 1-206.01 (2012 Repl.). It also precluded the Council from legislating on certain subjects. *See, e.g.*, D.C. Code § 1-206.02 (a)(1) (2012 Repl.) (the Council "shall have no authority" to "[i]mpose any tax on property of the United States"); D.C. Code § 1-206 (a)(5) (the Council "shall have no authority" to enact a so-called commuter tax on the income of persons who do not reside in the District).

Early drafts of the Act did not preclude the Council from enacting legislation that affected the local courts. Instead, a draft version of the statute permitted the Council to "pass acts affecting *all aspects* of [the District of Columbia] courts" after an "eighteen-month period following . . . the date of enactment of this Act." House Comm. on the District of Columbia, 93d Cong., 2d Sess., Home Rule for

the District of Columbia 942 (Comm. Print 1974) ("Home Rule Comm. Print") (emphasis added).

This proposal raised concerns among the bench and the bar. Both the Chief Judge of this court and the Chief Judge of the Superior Court wrote to the Chairman of the House Committee on the District of Columbia, pointing out that the District's new court system had been only recently established.[3] Home Rule Comm. Print at 1416-1424. Because it appeared that the draft of section 602 (c) would "authorize[] the Council eighteen months after it takes office, to completely alter and thus to obliterate the structure, organization and jurisdiction of the District of Columbia courts," *id.* at 1421, the judges strongly suggested "that the new judicial system should be allowed to mature and gain experience before [being] subject[ed] . . . to further major modifications." *Id.* at 1417. Other provisions of the draft, principally those dealing with the appointment and reappointment of judges, raised concerns about the independence of the judiciary, and hence the "effectiveness and fairness of the courts." *Id.* at 1419.

---

[3] *See* District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, 84 Stat. 473 (1970).

A subsequent draft substituted the language of § 1-206.02 (a)(4) that remains in effect today: "The Council shall have no authority to . . . [e]nact any act, resolution, or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)." Home Rule Comm. Print at 1315-26. This broad language is not self-explanatory, but must be interpreted keeping in mind the purposes of the provision and the breadth of matters addressed in Title 11.

### 4. Title 11 of the D.C. Code

While this case focuses narrowly on the provisions dealing with our jurisdiction to review particular orders of the Superior Court, Title 11 is extensive, addressing a wide range of topics, including the composition and organization of the courts, the qualifications and appointment of judges, the employment of law clerks and secretaries for judges, and the procedural rules used by the Superior Court and this court. *See, e.g.*, D.C. Code § 11-102 ("The highest court of the District of Columbia is the District of Columbia Court of Appeals."); D.C. Code § 11-702 ("The court [of appeals] shall consist of a chief judge and eight associate judges."); D.C. Code § 11-743 ("The District of Columbia Court of Appeals shall conduct its business according to the Federal Rules of Appellate Procedure unless

the court prescribes or adopts modifications of those Rules."); D.C. Code § 11-903 ("The Superior Court of the District of Columbia shall consist of a chief judge and 61 associate judges."); D.C. Code § 11-902 ("The Superior Court shall consist of the following: (1) The Civil Division. (2) The Criminal Division. (3) The Family Court. (4) The Probate Division. (5) The Tax Division."); D.C. Code § 11-946 ("The Superior Court shall conduct its business according to the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure (except as otherwise provided in Title 23)" or as modified in accordance with the statute); D.C. Code § 11-1501 (a), (b) ("The President of the United States shall nominate, and by and with the advice and consent of the Senate, shall appoint all judges of the District of Columbia courts . . . .  A person may not be appointed a judge . . . unless . . . ." ).[4]

## 5.  Maintaining the Balance

We have acknowledged that § 1-206.02 (a)(4) "must be construed as a narrow exception to the Council's otherwise broad legislative power 'so as not to thwart the paramount purpose of the [Home Rule Act], namely, to grant the inhabitants    of    the    District    of    Columbia    powers    of    local    self-

---

[4]  The version of Title 11 in force after the passage of the Court Reorganization Act but before the passage of the Home Rule Act covered these same topics.  *See* D.C. Code §§ 11-102, -702, -743, -903, -946, -1501 (1972).

government.'" *Andrew*, 110 A.3d at 629 (quoting *Bergman v. District of Columbia*, 986 A.2d 1208, 1226 (D.C. 2010)). As the legislative history demonstrates, this portion of the Home Rule Act was primarily concerned with preserving the organization and structure of the newly created court system (established in Title 11) and the independence of the judiciary. It thus seems clear that the Council does not have authority to change the method by which judges are appointed and removed, to change the number of judges on either court, or to create an intermediate court of appeals, to give just a few examples.

Section 1-206.02 (a)(4) also precludes legislation "with respect to" the jurisdiction of the courts. We have held, for example, that attempting to bypass the "contested case" requirement of the District of Columbia Administrative Procedure Act ("DCAPA") violates the Home Rule Act. *See, e.g.*, *Capitol Hill Restoration Soc'y v. Moore*, 410 A.2d 184, 186 (D.C. 1979) (holding that, by its terms, Title 11 gives this court jurisdiction "to review directly agency action taken *only* in a contested case." (emphasis added)). *But see District of Columbia v. Sullivan*, 436 A.2d 364, 367 (D.C. 1981) (holding "the Council nevertheless has the authority to enact legislative exceptions to that definition [of a contested case].").

When the Council's actions do not run directly contrary to the terms of Title 11, however, our past decisions have chosen not to interpret this language rigidly, but rather to construe this limitation on the Council's power in a flexible, practical manner. Thus, the Home Rule Act does not prevent the Council from changing the District's substantive law, even if those changes do "affect the jurisdiction of the courts in a sense." *Coleman v. District of Columbia*, 80 A.3d 1028, 1035 n.9 (D.C. 2013). *See Umana v. Swidler & Berlin, Chartered*, 669 A.2d 717, 724 n.15 (D.C. 1995) (noting that the Home Rule Act "does not . . . limit the Council's authority to enact or to alter the substantive law to be applied by the courts").

As the United States Court of Appeals for the District of Columbia Circuit explained in *Dimond v. District of Columbia*, "[a]lthough the partial abolition of a cause of action inevitably affects the cases a court adjudicates, this incidental byproduct does not amount to an alteration of the jurisdiction of the local and federal courts in violation of the [Home Rule] Act." 792 F.2d 179, 190 (D.C. Cir. 1986) (upholding Council legislation that imposed $5,000 medical expense threshold for personal injury tort claims brought by victims of car accidents). *See Coleman*, 80 A.3d at 1035 n.9 (upholding provision of the Comprehensive Merit Personnel Act foreclosing claims brought by unsuccessful applicants for

employment with the District); *Sullivan*, 436 A.2d at 368 (upholding statute that, by decriminalizing certain traffic offenses, eliminated the Superior Court's original jurisdiction over them and removed them "from the direct review jurisdiction of this court").

Nor does the Council impermissibly expand our jurisdiction when it gives the court authority to hear a new kind of case that falls within the courts' preexisting jurisdiction, broadly defined. *See District of Columbia v. Greater Washington Cent. Labor Council*, 442 A.2d 110, 117 (D.C. 1982) (holding that the Workers' Compensation Act's ("WCA") grant of authority to the Superior Court to "enforce compensation awards" already fell "within the equitable jurisdiction presently vested in the Superior Court"); *id.* (holding the WCA did not affect our jurisdiction, because Title 11 provides for our review of orders and decisions of the Mayor, the Council, or any agency of the District to the extent provided by the DCAPA, which permits review of final decisions relating to compensation orders).

In sum, we have not construed D.C. Code § 1-206.02 (a)(4) as rigidly as its language might permit.

**6. The Flexibility of Finality**

Similarly, we have not construed the concept of finality in a rigid fashion. There is no statutory definition of a "final order," and our case law, which as a "general rule" deems an order or judgment final when "all issues as to all parties have been disposed of," does not strictly enforce that definition. *Stuart*, 6 A.3d at 1221 (Steadman, J., dissenting). As Judge Steadman observed in *Stuart*, "our jurisprudence is riddled with exceptions to this [finality] rule." *Id.* Rather than repeat his analysis, we refer the reader to his comprehensive discussion.

If, in practice, this court has given finality a "practical rather than a technical construction," *Stuart*, 6 A.3d at 1223 (Steadman, J., dissenting) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 171 (1974)), it would not undermine the purposes of the Home Rule Act or threaten the independence of the judiciary if the Council, while legislating on matters of public interest (such as the value of arbitration in resolving disputes), "make[s] reasonable determinations" as to what orders and judgments should be appealable. *Id.*

**7. The Legislature's Role in Determining Appealability**

Indeed, our approach to the issue of appealability in this context has evolved significantly over time, due in part to enactments of the Council. In *Brandon v. Hines*, the Uniform Arbitration Act ("UAA") did not apply, so there was no legislative directive concerning when orders granting or denying motions to compel arbitration could be appealed. Moreover, we had yet to interpret the extent of our jurisdiction under D.C. Code § 11-721. We therefore sought guidance from federal case law construing the analogous federal statutes governing appellate jurisdiction. *Brandon*, 439 A.2d at 503-04. Using that analytical framework, we acknowledged holdings that in cases where "one party has sued . . . and the defendant moves to stay litigation pending arbitration, . . . an order granting or denying the stay is not an appealable 'final decision[]' under 28 U.S.C. § 1291." *Id*. at 504.

Instead, we conceived of such rulings as orders granting or refusing injunctions and applied the two-part *Carson* test recently adopted by the Supreme Court. *Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981). "When we appl[ied] th[e] second *Carson* criterion in the context of arbitration, we conclude[d] that denials— but not grants—of stays of litigation pending arbitration are appealable *interlocutory* orders . . . ." *Brandon*, 439 A.2d at 506-07 (emphasis added). In doing so, we relied heavily on the federal courts' understanding of Congress's

intent and its "preference for encouraging voluntary settlement of . . . claims." *Id.* at 506 (internal quotation marks omitted). *See id.* at 508 (noting that "a refusal to stay litigation pending arbitration . . . is appealable because it rejects the option of arbitration (originally chosen by the parties and *favored by the legislature*) and instead directs the parties to trial" (emphasis added)).

In 1977 the Council adopted the UAA, which specified that "[f]or purposes of writing an appeal," certain orders relating to arbitration "shall be deemed final." D.C. Code § 16-4317 (repealed 2008). Contrary to *Brandon*'s holding that orders denying a motion to arbitrate did not meet the general definition of a final order, the UAA included such orders on its "list of orders deemed to be final." *Am. Fed'n of Gov't Emps., AFL-CIO v. Koczak*, 439 A.2d 478, 480 (D.C. 1981). From that point forward, we "had no problem giving effect to [the Council's] determination that orders denying arbitration were [final and thus] appealable, citing consistently to D.C. Code § 16-4317 (a)(2) (repealed 2008)." *Stuart*, 6 A.3d at 1223 (Steadman, J., dissenting) (citing cases). We apparently did this out of deference to the Council, because, as Judge Steadman recognized, "one of the orders expressly made appealable by the [UAA] is an order denying arbitration, certainly not itself a final order under the general rule." *Id.* at 1220 n.2 (internal quotation marks omitted).

We continued to hold, however, that orders compelling arbitration were not final, and not appealable. As we explained in *Koczak*, the UAA omitted "an order to compel arbitration from the list of orders deemed to be final[,]" and "there [wa]s no indication in either the Act or its meager legislative history that the Council did not intend the Act's list of appealable final orders to be exhaustive." 439 A.2d at 480 (footnote omitted). We therefore held that an order compelling arbitration "is interlocutory and, hence, unappealable." *Id*. at 480.

The legislature has since modified its attitude toward arbitration. As introduced in January of 2007, the RUAA, like the UAA, authorized an appeal to "be taken from . . . [a]n order denying a motion to compel arbitration," but not from an order granting such a motion. D.C. Council, Report on Bill 17-50, at 64 of .pdf file (June 4, 2007) ("Report on Bill 17-50"), http://lims.dccouncil.us/Download/1511/B17-0050-COMMITTEEREPORT.pdf. In the final version passed by the Council, however, that provision was expanded to include "order[s] . . . granting a motion to compel arbitration." *Id.* at 33. *See* D.C. Code § 16-4427 (2012 Repl.). Although the legislative history does not explain why the list of appealable orders was expanded, it does acknowledge "the

view of many . . . that the arbitration process has been slanted in the favor of business over consumers." Report on Bill 17-50 at 2.

Significantly, the RUAA abandoned the "deemed final" language of the UAA. Recently in *Andrew* we held that the order compelling the parties to arbitrate was "not a final order and therefore [was] not appealable as such." 110 A.3d at 630. Nevertheless, we held that an appeal from an order compelling a consumer to arbitrate with a commercial entity based on an arbitration clause in an adhesion contract was "appealable as an interlocutory order under § 11-721 (a)(2)(A)." *Id*. at 630 & 633. Although in *Brandon*, we thought the second prong of *Carson* had not been satisfied with respect to orders compelling arbitration, we concluded in *Andrew* that the second prong had been satisfied in this particular context, given the Council's clear intent –"to provide consumers more protection where arbitration was entered into with a commercial entity by way of an adhesion contract." 110 A.3d at 634.

This history does not dictate an answer to the issue we address today. It does, however, lead us to conclude that the RUAA provides a proper basis for our jurisdiction that does not conflict with Title 11 or, by extension, with the Home

Rule Act.[5] First, in making decisions concerning appealability, we have given deference to the legislature's intent. Second, as demonstrated by our precedent from *Brandon* through *Andrew*, categorizing orders as "final" or "interlocutory" can be a fluid concept. Although the Council did not specify in the RUAA whether it considers orders compelling arbitration to be "final" or "interlocutory,"[6]

---

[5] "The requirement of finality serves the important policy goals of preventing 'the unnecessary delays resultant from piecemeal appeals.'" *Rolinski v. Lewis*, 828 A.2d 739, 745 (D.C. 2003) (quoting *Crown Oil & Wax Co. v. Safeco Ins. Co.*, 429 A.2d 1376, 1379 (D.C. 1981)). Accepting appeals from orders compelling arbitration may conflict with this general purpose, but, within this limited context, that is a policy matter for the Council to weigh. As shown in Judge Steadman's dissent, not every "piecemeal appeal" impermissibly expands our jurisdiction beyond the scope of Title 11.

Concerned about delay, *amicus* urges us not to permit appeals of orders compelling arbitration because doing so would "undermine the [Attorney/Client Arbitration Board's] Court-directed mission to provide clients with an effective and expeditious way to resolve disputes with attorneys." It is unlikely that a client would appeal such an order, because arbitration under D.C. Bar Rule XIII is triggered by a client's request. We leave for another day, where the issue is clearly presented, whether an attorney's appeal would be consistent with her obligation under Rule XIII. *See BiotechPharma*, 98 A.3d at 989 ("[I]f a client files a petition to arbitrate a fee dispute with a lawyer, 'the lawyer is deemed to have agreed to arbitrate.'" (quoting D.C. Bar Rule XIII)).

[6] In the absence of a clear, legislative directive, this court has used the two-prong *Carson* test to determine the appealability of arbitration orders. *See Brandon v. Hines*, 439 A.2d 496 (D.C. 1981). In *Andrew*, the fact that an order compelling arbitration would have satisfied the *Carson* test convinced us that the RUAA did not violate the Home Rule Act in those particular circumstances, involving consumer adhesion contracts. 110 A.3d at 633-36. Now that we have squarely held that D.C. Code § 16-4427 does not violate the Home Rule Act, it is

(continued…)

neither label would "contraven[e] the fundamental purpose of the jurisdictional limitation in D.C. Code § 11–721." *Stuart*, 6 A.3d at 1223 (Steadman, J., dissenting).

## B.  The Dispute Is Arbitrable

With our jurisdiction confirmed, we now reach the merits of this appeal – whether the trial court erred by ordering the parties to arbitrate the malpractice action.  Woodroof argues that she should not be compelled to arbitrate her claim because the Arbitration Agreement was ambiguous, selectively invoked to Cunningham's advantage, and an unenforceable consumer adhesion contract.  We disagree.

### 1.  Arbitrability

We review *de novo* "whether a particular dispute is arbitrable." *Haynes v. Kuder*, 591 A.2d 1286, 1289 (D.C. 1991).  When making this determination, "the court must inquire merely whether the arbitration clause is 'susceptible of an

---

(…continued)

no longer necessary to rely on *Carson* to establish our jurisdiction of an appeal from an order compelling arbitration.

interpretation' that covers the dispute." *Id.* (quoting *Am. Fed'n of Gov't Emps., Local 3721 v. District of Columbia*, 563 A.2d 361, 362 (D.C. 1989)). *See also* D.C. Code § 16-4406 (b) ("The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."). If the clause "possess[es] a certain amount of ambiguity," a "presumption" nevertheless applies to "construe any ambiguity in favor of arbitration." *Masurovsky v. Green*, 687 A.2d 198, 202 (D.C. 1997). *See 2200 M St. LLC v. Mackell*, 940 A.2d 143, 151 (D.C. 2007) ("[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." (quoting *AT&T Techs., Inc., v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986)).

The Arbitration Agreement clearly is "susceptible of an interpretation" that includes Woodroof's malpractice claim against Cunningham. It expressly provides for arbitration of "any dispute *as to legal malpractice*, that is, as to whether any legal services rendered under the foregoing Retainer Agreement were unnecessary or unauthorized or were improperly, negligently, or incompetently rendered" (emphasis added). Woodroof's complaint filed in Superior Court certainly seems to match that description. Although styled as an action for breach of fiduciary

duty, the complaint seeks money damages for Cunningham "callously and recklessly fail[ing] to demonstrate the diligence and zeal to meet litigation deadlines" – which allegedly resulted in the dismissal of her lawsuit and increased litigation costs.

Even so, Woodroof claims the Agreement to Arbitrate is "ambiguous" because Cunningham has used "shifting interpretations" of the agreement to her disadvantage. More specifically, she alleges that Cunningham unfairly litigated the fee dispute, breaching its contractual duties to arbitrate "All Claims" and ignoring its duties under Rule XIII. *See* D.C. Bar R. XIII (deeming an attorney "to have agreed to arbitrate disputes over fees for legal services . . . when such arbitration is requested by a present or former client"). She states, "[a]ppellant did not think she was signing an agreement to *only* arbitrate her *own malpractice claims*, while [Cunningham] could choose to arbitrate or litigate its claims." This argument that Cunningham should have arbitrated the fee dispute, does not call into question the agreement of the parties to arbitrate any malpractice claims.[7]

---

[7] The agreement does not expressly require the arbitration of all fee disputes. It provides, rather, that the "[f]iling of any action in any court by the Firm, or its attorneys, to collect any fee from the client shall not waive the right to compel arbitration of any malpractice claim." "However, following the assertion of any claim against the Firm, or its attorneys, any fee dispute, whether or not the subject of any existing court action, shall also be resolved by arbitration." Here,

(continued…)

Moreover, whether Cunningham has waived his right to arbitration by litigating the fee dispute but then compelling Woodroof to arbitrate the malpractice claim is "presumptively a question to be decided by the *arbitrator*, not the court." *Menna v. Plymouth Rock Assur. Corp.*, 987 A.2d 458, 465 (D.C. 2010) (emphasis added) (citing *Woodland Ltd. P'ship v. Wulff*, 868 A.2d 860, 865 (D.C. 2005)). *See also Woodland Ltd. P'ship*, 868 A.2d at 863 ("Any ambiguity as to the scope of the waiver must be resolved against waiver and in favor of arbitration.").

Ultimately, to the extent, if at all, that Cunningham's actions make the agreement ambiguous, any ambiguity is construed in favor of arbitration, and thus the Arbitration Agreement is "susceptible of an interpretation" that would include Woodroof's claim regarding the services rendered by Cunningham under the Retainer Agreement.

## 2. Consumer Adhesion Contract

Appellant also argues that the agreement is unenforceable as an "unconscionable" consumer adhesion contract. "A contract of adhesion is defined

---

(…continued)
the suit against Woodroof in Virginia for collection of fees was resolved before she filed the malpractice claim against Cunningham.

generally as one imposed upon a powerless party, usually a consumer, who has no real choice but to accede to its terms." *Andrew*, 110 A.3d at 633 n.8 (quoting *Ass'n of Am. Med. Colleges v. Princeton Review, Inc.*, 332 F. Supp. 2d 11, 16 (D.D.C. 2004)). "The party seeking to avoid enforcement of a contract on the grounds of unconscionability usually must prove 'an absence of choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Woodfield v. Providence Hosp.*, 779 A.2d 933, 937 n.1 (D.C. 2001) (quoting *Urban Invs. v. Branham*, 464 A.2d 93, 99 (D.C. 1983)).

This is the first time that appellant has raised this argument, so it is no surprise that the record does not support her claims.[8] She has failed to prove that she was "powerless" in her interaction with Cunningham or had "no real choice" in the contract terms. Woodroof admits that her own counsel helped her select Cunningham and was present during the "engagement meeting" with Cunningham. She presented no evidence that she objected to the contract or attempted to bargain

---

[8] Although Woodroof contended below that Cunningham forced her "into *a court system* [in Virginia] where it had grossly unequal bargaining power, [and] overwhelming superior resources in terms of knowledge and expertise, time and money" (emphasis added), she never argued that the Arbitration Agreement resulted from disparate bargaining power, a lack of opportunity for negotiation, or her inability to obtain services elsewhere. *See Andrew v. Am. Imp. Ctr.*, 110 A.3d 626, 635 (D.C. 2015) (describing the characteristics of a consumer adhesion contract).

for different terms. Essentially, Woodroof failed to show "that there was no opportunity for negotiation *and* that the services could not be obtained elsewhere." *Moore v. Waller*, 930 A.2d 176, 182 (D.C. 2007) (internal quotation marks omitted).

## II. The Foreign Judgment Proceedings

As mentioned above, in a separate case involving the same parties, Cunningham attempted to enforce a Virginia judgment for unpaid attorney's fees. That litigation is now complete. Both parties appealed, and there is no question with respect to our jurisdiction.

## A. Background and Procedural History

On January 7, 2011, Cunningham sued in Virginia for the remaining attorney's fees owed, and in September 2011, the Circuit Court for Arlington County entered a default judgment against Woodroof in the amount of $143,467.97. Cunningham later sought to enforce the judgment in the District of Columbia by filing a Request to File a Foreign Judgment in the Superior Court. The judgment was filed by the Clerk that same day. Once filed, a foreign

judgment "shall have the same effect and be subject to the same procedures, defenses, or proceedings for reopening, vacating, or staying as a judgment of the Superior Court and may be enforced or satisfied in the same manner." D.C. Code § 15-352 (2012 Repl.).

After a judgment lien was placed on Woodroof's condominium in the District, she filed a motion requesting relief pursuant to Super. Ct. Civ. R. 60 (b). Cunningham requested an extension of time to file a response (to which Woodroof conditionally consented), and on February 25, 2013, the court granted the extension with Woodroof's condition "that [Cunningham] will not take any action to enforce the foreign judgment in the District of Columbia until the instant Motion is resolved."

Before the parties returned to court, Woodroof paid Cunningham $75,000 to lift the lien so she could sell the condominium by April 5, 2013. In addition to "releas[ing] . . . the lien" on the condominium, Cunningham also agreed to "not proceed against any other properties [Woodroof] had in the District" and to "cancel all interest running on the [remaining] mon[ey] . . . owed." Nevertheless, on June 25, 2013, Woodroof filed a motion asking the trial court to hold Cunningham in contempt and award her sanctions, alleging that Cunningham's "demand" for

$75,000 constituted enforcement of the Virginia judgment in violation of the February 2013 order.

On August 26, 2013, Cunningham responded by asking the court to sanction Woodroof, alleging that her motions for contempt and sanctions were misleading and filed for improper purposes. The trial court denied the motions of both parties on the grounds that the February 2013 order was "ambiguous as to whether settlement discussions should be considered as an action to enforce the foreign judgment." The court did, however, grant Woodroof's request for relief from the foreign judgment "on the basis that the Arlington County Circuit Court did not have subject matter jurisdiction over [Cunningham's] claim" because "Rule XIII of the District of Columbia Bar Rules required mandatory adjudication [sic]" of the fee dispute "by the District of Columbia Attorney/Client Arbitration Board ('ACAB')."[9]

**B. The Motions for Contempt and Sanctions**

---

[9] Cunningham has not challenged the order granting relief from the foreign judgment, and we express no opinion about the propriety of that ruling.

Woodroof and Cunningham both complain that the trial court erred in denying their respective motions for contempt and sanctions. Woodroof argues that Cunningham should be held responsible for "forcing" her to pay $75,000 to lift the lien on her D.C. condominium and rejecting her alternative proposal to place unallocated funds from the sale in escrow. Cunningham contends that Woodroof's motion was frivolous; lacked an evidentiary basis; and was filed for the improper purposes of "circumventing settlement terms," "misleading the court," and "introducing irrelevant information."

However, "[f]or the trial court to issue a civil contempt order, the movant must make a clear and convincing showing that (1) the alleged contemnor is subject to a court order, and that (2) he or she has failed to comply with that order." *Wagley v. Evans*, 971 A.2d 205, 210 (D.C. 2009). We review both an adjudication of civil contempt and a trial court's decision to grant or deny a motion for sanctions for abuse of discretion. *Id.*; *Ruesch Int'l Monetary Servs. v. Farrington*, 754 A.2d 328, 331 (D.C. 2000).

Woodroof did not carry her burden of proving that Cunningham's "demand" to be compensated for releasing the lien on her condominium constituted an "action to enforce the foreign judgment" in contravention of the February 2013

order, nor did she prove that the consent decree forbade voluntary, negotiated settlements. As the trial court acknowledged in its oral ruling on May 29, 2014, the language of the order was "ambiguous as to whether settlement discussions should be considered as an action to enforce the foreign judgment." Nor, we add, did the order specify that a refusal to release an existing lien without consideration would be considered an "action to enforce the foreign judgment."

For these reasons, it is not "clear and unambiguous" that Cunningham's demand for $75,000 to release the lien constituted "contempt" of the court's order. On the other hand, as the trial court articulated, "given the . . . Court's own acknowledgment of the [ambiguous] language," Woodroof's motion to "test" whether Cunningham's "hard negotiation[s] . . . ran afoul of the Court's order" was "fair game." In other words, it was not "patently clear" that Woodroof's request for an adjudication of contempt and an award of sanctions had "absolutely no chance for success." *Ruesch*, 754 A.2d at 331 (quoting *Gray v. Washington*, 612 A.2d 839, 842 (D.C. 1992)). Therefore, the trial court did not abuse its discretion in denying the parties' motions for sanctions.

## III. Conclusion

The challenged order and the judgment of the Superior Court are hereby

*Affirmed.*