*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-0318

MORGAN BANKS, *et al.*, APPELLANTS,

V.

DAVID H. HOFFMAN, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2017-CA-005989-B)

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Argued En Banc February 25, 2025         Decided November 13, 2025)

(Amended January 29, 2026[*])

*Bonny J. Forrest*, with whom *Kirk Jenkins* and *John B. Williams* were on the briefs, for appellants.

---

[*] After the initial issuance of this opinion on November 13, 2025, the en banc court amended the opinion by revising some of the language in the two sentences that lead into footnote eight. The minor revisions to those sentences are meant to make clear that not all of the statutory citations in footnote eight concern immunity from suit, but some concern immunity from liability instead.

*Thomas G. Hentoff*, with whom *John K. Villa*, *Stephen J. Fuzesi*, *Krystal C. Durham*, and *Renee M. Griffin*, were on the brief, for appellees Sidley Austin LLP, Sidley Austin (DC) LLP, and David H. Hoffman.

*Barbara S. Wahl*, with whom *Randall A. Brater* and *Rebecca W. Foreman* were on the brief, for appellee American Psychological Association.

*Carl J. Schifferle*, Deputy Solicitor General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General for the District of Columbia, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *James C. McKay, Jr.*, Senior Assistant Attorney General, were on the brief, for appellee District of Columbia.

*Bilal K. Sayyed* and *Ari Cohn* filed a brief on behalf of TechFreedom as *amicus curiae* in support of appellees.

*Landis Cox Best*, *Britney R. Foerter*, *Lisa J. Cole*, *Elizabeth Tang*, *Elizabeth Vogel*, *Rachel Smith*, *Jennifer Mondino*, *Micaela C. Deming*, and *Alexandra S. Drobnick* filed a brief on behalf of National Women's Law Center, D.C. Coalition Against Domestic Violence, DV Leap, & Ten Other Individual & Organizational Survivor Advocates in D.C. as *amici curiae* in support of appellees.

*Laura R. Handman* and *Eric J. Feder* filed a brief on behalf of Amazon Watch, The American Civil Liberties Union of the District of Columbia, The Center for Biological Diversity, The Civil Liberties Defense Center, Direct Action Everywhere, Electronic Frontier Foundation, Greenpeace, Inc., The Mosquito Fleet, People for the Ethical Treatment of Animals, Inc., and The Union of Concerned Scientists, as *amici curiae* in support of appellees.

*Daniel P. Golden*, *Nicole L. Streeter*, *Lauren R.S. Mendonsa*, and *Wei Guo* filed a brief on behalf of Council of the District of Columbia as *amicus curiae* in support of appellees.

*Katie Townsend*, *Mara Gassmann*, and *Zachary Babo* filed a brief on behalf of the Reporters Committee for Freedom of the Press and 32 Media Organizations as *amici curiae* in support of appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH, EASTERLY, DEAHL, HOWARD, and SHANKER, *Associate Judges*.

Opinion for the unanimous court by *Associate Judge* DEAHL.

DEAHL, *Associate Judge*: This case concerns whether the D.C. Council exceeded its authority under the Home Rule Act when it passed the District's Anti-SLAPP Act. The Home Rule Act precludes the Council from passing any law "with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)." *See* D.C. Code § 1-206.02(a)(4). Title 11 of the D.C. Code, in turn, provides that the District's Superior Court "shall conduct its business according to the Federal Rules of Civil Procedure . . . unless it . . . adopts," and this court approves, "rules which modify those Rules." D.C. Code § 11-946.

Appellants argue that the Anti-SLAPP Act violates the Home Rule Act because it truncates discovery in certain Superior Court proceedings—namely, those deemed to be "strategic lawsuits against public participation," or SLAPPs, which are basically suits filed to silence someone from exercising their free speech or petition rights by burdening them with costly litigation so that they abandon their criticisms. In appellants' view, that truncated discovery process alters the Superior Court's procedural rules in a manner that only the District's courts and Congress have the authority to do, per Section 11-946. A division of this court agreed with appellants that the Anti-SLAPP Act's discovery limiting provisions intruded into Title 11 and thus violated the Home Rule Act, and this court granted en banc review. *See Banks v. Hoffman*, 301 A.3d 685 (D.C. 2023), *vacated by* 308 A.3d 201 (Mem.) (Order granting en banc review).

We disagree with appellants and now hold that the D.C. Council did not exceed its authority by passing the Anti-SLAPP Act. While we acknowledge this case presents a close question about which reasonable minds can differ, we conclude that the Anti-SLAPP Act does not run afoul of Section 1-206.02(a)(4) because it does not modify Title 11 itself, it does not run directly contrary to Title 11, nor does it otherwise alter the fundamental organization or jurisdiction of the District's courts. The Act instead creates supplementary procedures for a small subset of cases in a manner that remains consistent with Title 11. This court has consistently read the Home Rule Act's restrictions on the Council's authority narrowly, in recognition of the Council's "broad authority" to legislate on local matters. *Andrew v. Am. Import Ctr.*, 110 A.3d 626, 628-29 (D.C. 2015). Most states have passed legislation comparable to our Anti-SLAPP Act, complete with similar procedural aspects, and yet no court in this country has deprived its local legislature of the authority to pass anti-SLAPP legislation. The Home Rule Act does not require us to more tightly constrict our local legislature, as Congress showed no interest in doing that when passing the Act.

We explain ourselves in three parts: First, we detail the relevant history and foundations of the Home Rule Act, as well as its limitation on the Council's power to enact legislation with respect to Title 11. Second, we explain why the Anti-SLAPP Act does not run afoul of that limitation. Third, we explain why the

appellants' contrary view suffers from a number of critical flaws. Chief among them is that they would have us strictly police the "substantive law" versus "procedural rule" divide, a creature of federalism concerns not pertinent here, and they would further thrust the District's courts into a policymaking role that we are fundamentally ill-suited for. We now address those three points in turn.

## I. The Home Rule Act grants the Council broad authority to legislate, so long as it does not directly alter Title 11 or fundamentally alter our court system

The Home Rule Act is akin to a Constitution for the District, providing the basic groundwork and structure for our local government. *See Washington, D.C. Ass'n of Realtors, Inc. v. District of Columbia*, 44 A.3d 299, 303 (D.C. 2012) ("The Home Rule Act operates much like a state constitution.").

Congress passed the Home Rule Act in 1973 to "grant to the inhabitants of the District of Columbia powers of local self-government," allowing residents to vote for a mayor and city councilpersons and providing the District with the power to control the agencies and organizations that affect residents' daily lives. D.C. Code § 1-201.02(a). Although Congress retained "the right, at any time, to exercise its constitutional authority as legislature for the District," *id.* § 1-206.01; U.S. Const. art. I, § 8, cl. 17, the Home Rule Act "relieve[d] Congress of the burden of legislating upon essentially local District matters." D.C. Code § 1-201.02(a); *see also* S. Rep.

No. 93-219, at 4 (1973) (The Act granted the District lawmaking authority over "those matters municipal as distinguished from those national in scope."), *reprinted in* Staff of H. Comm. on D.C., 93d Cong., Home Rule for the District of Columbia: Background and Legislative History at 2724 (Comm. Print 1974) [hereinafter House Comm. Print].

The Act granted the "D.C. Council broad authority to legislate upon 'all rightful subjects of legislation within the District,'" *Andrew*, 110 A.3d at 628 (quoting D.C. Code § 1-203.02), while carving out certain exceptions from the District's legislative power. One exception, at issue in this case, is that "[t]he Council shall have no authority to . . . [e]nact any act, resolution, or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)." D.C. Code § 1-206.02(a)(4).

To explain that provision, let us rewind to three years before the Home Rule Act's passage, when Congress enacted the Court Reorganization Act of 1970. The Court Reorganization Act, codified in Title 11 of the D.C. Code, details the "organization, administration[,] and jurisdiction" of the District's courts. *See* House Comm. Print at 1450. The purpose of that act was similar to what animated the Home Rule Act itself: It was meant to shift federal jurisdiction over essentially local matters to a newly created D.C. court system, featuring the Superior Court of the

District of Columbia and this court. *See generally Woodroof v. Cunningham*, 147 A.3d 777, 782-84 (D.C. 2016). This new court system needed procedural rules to operate, and Congress provided those in the Court Reorganization Act as follows:

> The Superior Court shall conduct its business according to the Federal Rules of Civil Procedure . . . unless it . . . adopts rules which modify those Rules. Rules which modify the Federal Rules shall be submitted for the approval of the District of Columbia Court of Appeals, and they shall not take effect until approved by that court. The Superior Court may adopt and enforce other rules as it may deem necessary without the approval of the District of Columbia Court of Appeals if such rules do not modify the Federal Rules.

D.C. Code § 11-946.

To paraphrase that provision, Congress set the federal rules of procedure as the default in the Superior Court. At the same time, Congress made its disinterest in micromanaging those procedural rules clear, providing that the Superior Court was free to modify or supplant those rules whenever and for whatever reason we wanted, so long as this court approved. And the Superior Court could unilaterally promulgate any "other rules," without this court's approval, that did not modify the federal rules. Congress said nothing about whether the Council could modify or supplement the court's procedural rules, of course, because the Council in its modern form had not

yet been created.[1]  The only relevant legislature at the time was Congress, which was just as free as the District's courts to amend or supplement those rules.

Now, back to the Home Rule Act.  An early draft of that Act would have allowed the Council to "pass acts affecting all aspects of [the District's] courts," permitting the Council to shift various matters back to the federal courts, to change our judicial selection processes, to eliminate judgeships, and to eliminate our newly forged courts entirely.  House Comm. Print at 942 (proposing to grant such authority eighteen months after the date of enactment); *Woodroof*, 147 A.3d at 783.  That led to some understandable backlash—our courts were just finding their legs, and allowing the Council to upend our organization and structure would threaten their core functions.  The Chief Judge of this court at the time, Gerard D. Reilly, voiced those institutional concerns in a letter to Congress, arguing that "the new judicial system should be allowed to mature and gain experience before subjecting it to further major modifications."  House Comm. Print at 1417.  Chief Judge Reilly's concerns were with avoiding a big-picture structural upheaval of our newly minted court system—"drastic changes," as he put it—like with how judges are selected and

---

[1] There was a nine-member presidentially appointed D.C. Council with rather limited powers established in 1967, several years prior to both the Court Reorganization and the Home Rule Acts.  *See* Reorganization Plan No. 3 of 1967, 32 Fed. Reg. 11669 (Aug. 12, 1967), *reprinted in* 81 Stat. 948 (1967).  The modern D.C. Council that we are concerned with was established by the Home Rule Act.

reappointed, or with how jurisdiction is divided with our federal counterparts across the street. *Id.* at 1416-18. He voiced no concern with the Council possibly altering the minutiae of the finer procedural rules governing the District's court proceedings.

Another member of our newly minted courts, Superior Court Chief Judge Harold H. Greene, voiced the same broad institutional concerns. In his view, allowing the D.C. Council to "completely alter" and "obliterate the structure, organization and jurisdiction" of the District's courts would "negate all the vested rights of the judicial and nonjudicial personnel of the court system." *Id.* at 1421-22. Chief Judge Greene suggested two changes to the draft Home Rule Act to prevent that: (1) eliminate the section that allowed the Council to pass acts affecting "all aspects" of the courts; and (2) add a provision stating that "the organization and jurisdiction of the District of Columbia courts shall be governed by title 11." *Id.* at 1423-24. Congress took note of Chief Judge Greene's requests and acceded to them. The conference committee, to accommodate those requests, agreed that the Home Rule Act should make clear that only Congress, and not the Council, had "authority over the composition, structure[,] and jurisdiction of the D.C. Courts." H.R. Rep. No. 93-703, at 77 (1973), *reprinted in* House Comm. Print at 3015.

To that end, when Congress passed the Home Rule Act, it modified its earlier draft to preclude the Council from "[e]nact[ing] any act, resolution, or rule with

respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)."  D.C. Code § 1-206.02(a)(4).  As the legislative history makes clear, Congress added this provision to (1) keep the Court Reorganization Act intact and (2) enshrine the separation of powers between the legislature and the judiciary.  *Woodroof*, 147 A.3d at 784 (Section 1-206.02(a)(4) "was primarily concerned with preserving the organization and structure of the newly created court system (established in Title 11) and the independence of the judiciary.").  This section served as a preventive measure to ensure that the Council could not pass legislation to "change the method by which judges are appointed and removed, to change the number of judges on either court, or to create an intermediate court of appeals," *id.*, and to prevent comparable structural or jurisdictional changes.

As a textual matter, the parenthetical phrase in Section 1-206.02(a)(4)— "relating to organization and jurisdiction of the District of Columbia courts"—was no throwaway, contrary to appellants' argument.  As the above statutory history makes evident, that clause is the sine qua non of Section 1-206.02(a)(4) and captures its essence.  *See Bergman v. District of Columbia*, 986 A.2d 1208, 1225-26 (D.C. 2010) (holding that Section 1-206.02(a)(4) was not violated where an act, on its face, "does not affect the organization or jurisdiction either of this court or the Superior Court").  That language signifies precisely the types of structural changes that Congress sought to preclude the Council from making.  Congress deliberately chose

the words "organization and jurisdiction," rather than, say, "rules and procedures," because it was those big-picture issues that it wanted to prevent the D.C. Council from interfering with. In other words, Congress was telling the Council that it was reserving the power to make fundamental or structural changes to the District's courts for itself. Outside of those big-picture alterations, the Home Rule Act empowered the elected Council to legislate on behalf of District residents.

The appellants argue to the contrary, positing that Section 1-206.02(a)(4)'s "relating to" parenthetical was just a duplicative reference to Title 11's caption— "Organization and Jurisdiction of the Courts"—so as to render the parenthetical meaningless. That is not the best interpretation of that provision. First, it is undercut by the legislative history recounted above,[2] demonstrating that Congress was specifically implementing Chief Judge Greene's suggestion and depriving the Council of "authority over the composition, structure[,] and jurisdiction of the D.C.

---

[2] The only specific reference to our courts' rulemaking authority in the Chief Judges' letters came in Chief Judge Greene's letter where he expressed concerns that the Home Rule Act's initial draft could leave the courts' "authority to adopt court rules" in doubt. House Comm. Print at 1422. It would indeed be a massive change to our court system if the Council attempted to divest our courts of their rulemaking powers—as it was empowered to do under the Home Rule Act's initial draft—and we would have little difficulty concluding that would be an impermissible intrusion into Title 11 because it would run directly contrary to it. But Chief Judge Greene did not in that sentence suggest that he was concerned with whether the Council's enactments might affect court processes in more discrete ways while leaving our general rulemaking authority in place, as the Anti-SLAPP Act does.

Courts." H.R. Rep. No. 93-703, at 77. Consistent with that history, we read that parenthetical as critical to understanding 1-206.02(a)(4)'s command.[3] Second, the reference to Title 11 was not otherwise opaque or in need of any clarification. The D.C. Code is replete with express references to Title 11, and nowhere else does it seek to aid the reader in finding that Title by imprecisely restating its caption. *See, e.g.*, D.C. Code §§ 1-821.01, 16-3901, 21-502(a), 22-3571.02(c).

Our cases have long aligned with our holding today that Section 1-206.02(a)(4) must be read "narrowly" to mean only "that the Council is precluded from amending Title 11 itself." *Price v. D.C. Bd. of Ethics & Gov't Accountability*, 212 A.3d 841, 845 (D.C. 2019). That is consistent with this court's repeated

---

[3] There are certainly times where such parentheticals are best read as appellants suggest, as merely "alert[ing] readers to the nature of the otherwise anonymous section numbers." *See Oppedisano v. Holder*, 769 F.3d 147, 150 (2d Cir. 2014); *see also Fid. & Deposit Co. of Md. v. Stromberg Sheet Metal Works, Inc.*, 532 A.2d 676, 678 (D.C. 1987) (reading parenthetical phrase as merely indicating the nature of, rather than delimiting, prior reference to sections of the U.S. Code); *but see Voss v. Comm'r of Internal Revenue,* 796 F.3d 1051, 1059-60 (9th Cir. 2015) (explaining that statutes should not be interpreted in a way that "parentheticals would be superfluous"). But that is neither a hard-and-fast rule nor even a reliable presumption. We have applied that line of thinking only after "consider[ing] . . . the background" of the relevant Act "as a whole," and providing a "detailed examination of the structure of" the Act and why it supported that conclusion. *Fid. & Deposit Co. of Md.*, 532 A.2d at 678. Here, the background and structure of the Home Rule Act indicate that Section 1-206.02's parenthetical reference to the "organization and jurisdiction" of the District's courts was not merely clarifying, but essential to understanding the section's core purpose.

proclamations that this provision should not be construed to defeat the Home Rule Act's more overarching purpose of promoting self-governance. *Bergman*, 986 A.2d at 1226 ("[T]his court and the United States Court of Appeals for the District of Columbia Circuit have consistently held . . . that restrictions on the legislative authority of the Council in § 1-206.02(a)(4) must be narrowly construed.").

For example, in *Bergman*, 986 A.2d at 1225-26, we considered an issue very similar to the one we confront today. Title 11 dictates that this court "shall" make rules regulating bar admission and membership, D.C. Code § 11-2501(a), and the question in *Bergman* was whether Section 1-206.02(a)(4) precluded the Council from intruding into that sphere of this court's authority. We answered that firmly in the negative, explaining that nothing in the Home Rule Act made the powers conferred on this court in Title 11 exclusive to us, with a parting shot that "it would be an inappropriate exercise of judicial power to restrict the legislative authority of our elected representatives" by precluding the Council from passing its own laws about bar admission and membership. *Bergman*, 986 A.2d at 1230. Put another way, in words equally applicable to the Anti-SLAPP Act, "the Council's passage of the Act, in the exercise of its power to enact legislation of general applicability, does not impermissibly burden or unduly interfere with this court's authority to exercise its core functions." *Id.* This court has similarly emphasized that the Home Rule Act does not preclude the Council from passing laws that "affect the kinds of cases that

the courts adjudicate" altogether, *Woodroof*, 147 A.3d at 781, so the Council can eliminate certain claims from being adjudicated in our courts or prevent certain classes of litigants from bringing or being subjected to certain claims entirely. *See Coleman v. District of Columbia*, 80 A.3d 1028, 1035 n.9 (D.C. 2013) (rejecting Home Rule Act challenge to statute that eliminated causes of action).

That has been the consistent thrust of our precedents interpreting the intersection of the Home Rule Act and the Court Reorganization Act, congruent with their text and legislative history. The Council cannot directly amend Title 11 or otherwise alter the District's courts' structure, jurisdiction, or fundamental powers, but it is not precluded from legislating in areas that the courts likewise have some domain over under Title 11.

## II. The Anti-SLAPP Act does not amend Title 11 or alter the organization, structure, jurisdiction, or rulemaking authority of the District's courts

That brings us to the District's Anti-SLAPP Act and whether its discovery-limiting provisions impermissibly intrude into the District's courts' powers under Title 11. That is, is the Anti-SLAPP Act an Act "with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)," D.C. Code § 1-206.02(a)(4), which the Council lacks authority to pass? Appellants contend that it is, because the Anti-SLAPP Act's discovery-limiting

provisions alter the procedural ground rules in a subset of Superior Court cases by truncating the discovery rights that plaintiffs typically have, contrary to Title 11's mandate that the Federal Rules of Civil Procedure govern Superior Court procedures except to the extent those rules are modified by the courts.[4]  To assess that argument, we first take a deeper dive into the Anti-SLAPP Act itself.

*A. The Anti-SLAPP Act and how it works*

Strategic lawsuits against public participation, or SLAPPs, in their most classic form are lawsuits brought against individuals to chill the exercise of their First Amendment rights.  *See generally* George W. Pring, *SLAPPs: Strategic Lawsuits Against Public Participation*, 7 Pace Env't. L. Rev. 3 (1989).  Think of an animal rights activist who, in a public broadcast, complains about a meat producer's inhumane slaughter of animals.  The meat producer might sue that activist for

---

[4] We note at the outset that Title 11 does not quite say that: recall that Section 11-946 provides that the Superior Court can unilaterally promulgate "other rules," without even this court's approval, so that Title 11 plainly does not direct that the court conduct itself *exclusively* according to the federal rules as modified by our courts.  Instead, Section 11-946 contemplates that some "other rules" can be promulgated that will not qualify as modifications of the federal rules at all.  The parties do not explore this statutory caveat, nor do our precedents, and it raises a fairly elusive distinction of when a new rule constitutes a modification of the federal rules versus an "other rule[]."  We note this caveat only as some indication that when Congress passed Title 11 it did not contemplate the federal rules being the only rules that could govern Superior Court proceedings—they could be otherwise supplemented.

defamation, knowing full well that it has no legitimate grounds for suit, for the sole purpose of miring the activist in protracted and costly litigation—that might shut them, and others like them, up. That's a SLAPP, and the Anti-SLAPP Act is meant to root out and mitigate the damaging effects of such suits.[5] The Act attempts to accomplish that goal by providing District residents "substantive rights to expeditiously and economically dispense of litigation aimed to prevent their engag[ement] in constitutionally protected actions on matters of public interest." Anti-SLAPP Act of 2010, Report on Bill No. 18-893 before the Committee on Public Safety and the Judiciary, Council of the District of Columbia, at 4 (Nov. 18, 2010) [hereinafter D.C. Council Committee Report]. The Act, in other words, "incorporates substantive rights with regard to a defendant's ability to fend off lawsuits filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view." *Id.* at 1.

More concretely, the Anti-SLAPP Act allows defendants, within forty-five days of being served with a complaint, to "file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public

---

[5] There are potent criticisms that anti-SLAPP acts do a lousy job of serving that purpose and instead give corporations just one more tool for stifling their detractors. *See Navellier v. Sletten*, 52 P.3d 703, 714 (Cal. 2002) (Brown, J., dissenting) ("The cure has become the disease—SLAPP motions are now just the latest form of abusive litigation."). But those are critiques of a policy judgment that we are bound to leave to the Council.

interest." D.C. Code § 16-5502(a). The defendant must "make[] a prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest." *Id.* § 16-5502(b). If they can do that, their motion to dismiss "shall be granted unless the [plaintiff] demonstrates that the claim is likely to succeed on the merits." *Id.*; *see generally Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226-27, 1232-33 (D.C. 2016) (describing the special motion to dismiss).

The key feature of the Anti-SLAPP Act is that it saves litigants from the potentially years-long and prohibitively expensive discovery that often accompanies even baseless litigation, thereby reducing the chilling effects that abusive lawsuits have on First Amendment activity. Once a special motion to dismiss is filed, "discovery proceedings on the claim [are] stayed until the motion has been disposed of." D.C. Code § 16-5502(c)(1). There is a narrow exception to this in recognition of the plaintiff's interests, whereby a plaintiff may request and receive some "specified" discovery if it "appears likely that targeted discovery will enable the plaintiff to defeat the motion and that the discovery will not be unduly burdensome." *Id.* § 16-5502(c)(2). The provisions, together, reflect a careful balancing of the interests in protecting public advocates from "expensive and time consuming" discovery—one of the more draining components of litigation, *see* D.C. Council Committee Report at 4—and the interests that plaintiffs have in receiving their day

in court.  The Act is directly targeted at the litigation process because "*[l]itigation itself* is the plaintiff's weapon of choice" to "intimidate" people "into silence."  D.C. Council Committee Report at 4.

*B. The Anti-SLAPP Act is within the Council's broad authority to legislate*

We are faced with two competing views about how to best interpret Section 1-206.02(a)(4)'s restriction on the Council's authority.  On one view, as the appellants argue, the Anti-SLAPP Act is an Act "with respect to Title 11" because it affects court procedures for a suit once the defendant makes a prima facie showing that it is a SLAPP.  It therefore contravenes Title 11's command that the federal rules as modified by the District's courts govern Superior Court procedures, or so the argument goes.  On the other view, advanced by the District and its amici in defense of the Act, only laws that directly amend Title 11 or upset the organization and jurisdiction of the District's courts run afoul of Section 1-206.02(a)(4).  Laws that have mere incidental or supplementary effects on court procedures to advance policy goals, like the Anti-SLAPP Act, remain within the Council's purview.

The District's interpretation is the better one.  It aligns with the purpose of Section 1-206.02(a)(4), and it is more faithful to the overall purpose of the Home Rule Act, which was to ensure the Council had "broad authority to legislate upon 'all rightful subjects of legislation within the District.'"  *Andrew*, 110 A.3d at 628

(quoting D.C. Code § 1-203.02). It is also the interpretation that far better comports with this court's long held view that Section 1-206.02(a)(4) "must be construed as a narrow exception to the Council's otherwise broad legislative power 'so as not to thwart the paramount purpose of the Home Rule Act, namely, to grant the inhabitants of the District of Columbia powers of local self-government.'" *Woodroof*, 147 A.3d at 784 (quoting *Andrew*, 110 A.3d at 629).

We hold today that the Council does not run afoul of Section 1-206.02(a)(4) so long as (1) it does not affect the "organization and jurisdiction" of the District's courts, which is what Section 1-206.02(a)(4) was principally meant to stave off; (2) it does not divest our courts of rulemaking authority, though we think this second point fairly fits within the first;[6] (3) it does not alter or "run directly contrary to" Title 11 itself, *see Woodroof*, 147 A.3d at 784; and (4) it does not otherwise fundamentally alter our courts or seek to micromanage the day-to-day procedures

---

[6] We flag one topic that we do not resolve today: In the unlikely event that the District's courts promulgated a rule that directly abrogated the Anti-SLAPP Act's discovery provisions (or any of the Council's other policy judgments that affect court rules), we do not opine on who would prevail in that power struggle, i.e., whether the statute or the court rule would control proceedings. The fact is that there is no power struggle here, as the District's courts have never taken any action indicating their disapproval of and seeking to displace the Anti-SLAPP Act's procedural aspects.

that govern court proceedings. The Anti-SLAPP Act does none of those things, so it does not run afoul of Section 1-206.02(a)(4)'s restriction on the Council.

The Anti-SLAPP Act—crafted according to the policy judgments of our local legislature—is a routine example of the Council "legislating upon essentially local District matters." D.C. Code § 1-201.02(a). Presuming that Congress "acted rationally and reasonably, with an awareness of the goals of the statutory scheme as a whole," and keeping in mind "the policies intended to be furthered by the legislation," *Expedia, Inc. v. District of Columbia*, 120 A.3d 623, 631 (D.C. 2015) (quoting *In re C.L.M.*, 766 A.2d 992, 996-97 (D.C. 2001)), the Home Rule Act permitted the Council to enact the Anti-SLAPP Act to protect District residents from lawsuits that stifle free debate on matters of public interest.

As support, we note that various state constitutions preclude the legislature from micromanaging or fundamentally restructuring their judiciaries, similar to how the Home Rule Act restricts the Council from altering our court system's organization and structure. *E.g.*, *Mellowitz v. Ball State Univ.*, 221 N.E.3d 1214, 1221 (Ind. 2023) (citing Ind. Const. art. 1, § 1); *People v. Warren*, 671 N.E.2d 700, 710-11 (Ill. 1996); *Berkson v. LePome*, 245 P.3d 560, 564-65 (Nev. 2010); *Massey v. David*, 979 So.2d 931, 936 (Fla. 2008). And yet no state court has ever held that their state's anti-SLAPP act intrudes upon that division of power, despite the fact

that a substantial majority of states have anti-SLAPP acts of their own.[7] *See Anti-SLAPP Legal Guide*, Reps. Comm. for Freedom of the Press, www.rcfp.org/anti-slapp-legal-guide (last visited Oct. 29, 2025) ("As of June 2025, 38 states and the District of Columbia have anti-SLAPP laws.").

For example, in Indiana, the state constitution establishes the separation of powers between the legislative and judicial branches: "Enacting laws" is a "legislative function," whereas "promulgating procedural rules for litigating disputes about those laws is part of the judicial function." *Mellowitz*, 221 N.E.3d at 1221. Yet the Indiana Supreme Court has found that the state's anti-SLAPP act—which has a discovery-limiting provision like ours, *see* Ind. Code Ann. § 34-7-7-6—

---

[7] Two states—Washington and Minnesota—struck down their anti-SLAPP statutes because they required plaintiffs to show "by clear and convincing evidence" that their suits were likely to succeed in order to defeat a special motion to dismiss. That heightened evidentiary standard violated each state's constitutional rights to a jury trial. *See Davis v. Cox*, 351 P.3d 862, 875 (Wash. 2015) (en banc) (holding that the heightened evidentiary standard "violates the right of trial by jury" under the state's constitution); *Leiendecker v. Asian Women United of Minn.*, 895 N.W.2d 623, 637 (Minn. 2017) (same). Both states have since revised their anti-SLAPP statutes to comply with those rulings, and notably, both statutes still limit discovery. *See* Wash. Rev. Code Ann. § 4.105.030(1)(a); Minn. Stat. Ann. § 554.10(a)(1). Our own Anti-SLAPP Act does not impermissibly intrude on the jury trial right because we have interpreted it, after invoking the doctrine of constitutional avoidance, to set a much lower bar for a suit to proceed. *See Mann*, 150 A.3d at 1236 (The constitutional avoidance canon "leads us to interpret the phrase 'likely to succeed on the merits,' undefined in the D.C. Anti-SLAPP statute, in a manner that does not supplant the role of the fact-finder, lest the statute be rendered unconstitutional.").

did not conflict with the state's constitution because the Act did not "micromanage the courts" and "address[ed] a substantive concern: a chill on citizens' free speech rights." *Mellowitz*, 221 N.E.3d at 1222.

Our interpretation is further bolstered by the fact that the Council can undoubtedly pass legislation that more directly and severely upends the normal procedural rules and available remedies for certain subsets of claims. For instance, it is undisputed that the Council can insulate certain individuals and entities from legal exposure, by making them immune from suit or liability, without exceeding its powers under the Home Rule Act.[8] We have similarly held that the Council can shift

---

[8] *See, e.g.*, D.C. Code § 1-301.42 ("For any speech or debate made in the course of their legislative duties, the members of the Council shall not be questioned in any other place."); *id.* § 7-531.09 ("With respect to their participation in the [Volunteer Service Credit Program] or a demonstration project, the District government and its agencies, officials, and employees and sponsors and their advisory committees, officials, and employees shall be immune from civil or criminal liability if they have acted in good faith."); *id.* § 7-1908 ("Any person who reports an alleged case of abuse, neglect, self-neglect, or exploitation pursuant to § 7-1903 shall be immune from civil or criminal liability for so reporting if he, she, or it has acted in good faith."); *id.* § 49-1101.11(e) ("The Interstate Commission's executive director and its employees shall be immune from suit and liability, either personally or in their official capacity, for a claim for damage to or loss of property or personal injury or other civil liability caused or arising out of or relating to an actual or alleged act, error, or omission that occurred, or that such person had a reasonable basis for believing occurred, within the scope of Interstate Commission employment, duties, or responsibilities; provided, that such person shall not be protected from suit or liability for damage, loss, injury, or liability caused by the intentional or willful and wanton misconduct of such person."); *id.* § 31-5414(a)

certain categories of cases outside of the court system and into administrative adjudication, thereby rendering our court rules wholly inapplicable to those cases; and, even more broadly, the Council can extinguish entire categories of claims altogether, as it sees fit. *See, e.g.*, *District of Columbia v. Sullivan*, 436 A.2d 364, 365-66 (D.C. 1981) (rejecting Home Rule Act challenge to statute that decriminalized minor traffic offenses and substituted administrative adjudication); *Coleman*, 80 A.3d at 1035 n.9 (rejecting Home Rule Act challenge to statute foreclosing certain causes of action).

The power to do those considerably more drastic things, by any logic, must encompass the more modest power to limit the discovery that a certain subset of plaintiffs are entitled to unless and until they can clear some threshold hurdles. *See Mann*, 150 A.3d at 1229-30 (The Anti-SLAPP Act is "analogous to qualified immunity for official conduct in that its application depends on the court's resolution

---

("There shall be no liability on the part of . . . any member insurer or its agents or employees, the [Life and Health Insurance Guaranty] Association or its agents or employees, members of the Board of Directors, or the Mayor or the Mayor's representatives, for any action or omission by them in performance of their powers and duties under this chapter, except in the case of willful misconduct, gross negligence, or criminal activity on the part of these persons."); *id.* § 3-1251.08 ("The members of the [Committee on Impaired Nurses] shall be immune from liability in the exercise of their duties."); *id.* § 4-1321.04 ("Any person, hospital, or institution participating in good faith in the making of a report pursuant to this subchapter shall have immunity from liability, civil or criminal, that might otherwise be incurred or imposed with respect to the making of the report.").

of whether the acts complained of entitle the defendant not to stand trial 'under certain circumstances.'" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985))); D.C. Council Committee Report at 4 ("Following the lead of other jurisdictions, which have similarly extended absolute or qualified immunity to individuals engaging in protected actions, [the Act] extends substantive rights to defendants in a SLAPP."). As the Council aptly describes in its amicus brief, the Anti-SLAPP Act's special motion to dismiss provides certain individuals with "qualified immunity against discovery," much like the many immunity statutes enacted by the Council on countless other occasions. So just like those immunity statutes, the Anti-SLAPP Act does not exceed the Council's authority.

## III. Responses to the appellants' remaining arguments

The appellants' contrary view is that the Anti-SLAPP Act's discovery-limiting provisions' "procedural nature" means the Act necessarily infringes on our rulemaking authority, thereby violating Title 11. Under that view, the Council is restricted to enacting purely "substantive" laws that do not affect court procedures. We disagree, for three principal reasons.

*A. The Superior Court's rules are unmodified and still apply in every case*

The appellants' interpretation, while a plausible enough reading of Section 1-206.02(a)(4) in isolation, is by no means compelled by its text.[9] Recall that this provision precludes the Council from "[e]nact[ing] any act, resolution, or rule with respect to any provision of Title 11," which in turn dictates that "[t]he Superior Court shall conduct its business according to the Federal Rules of Civil Procedure," though the District's courts are free to modify those rules (as we frequently do) and the Superior Court can unilaterally promulgate "other rules" governing its procedures. D.C. Code §§ 1-206.02(a)(4), 11-946. Title 11 does not say the Superior Court shall be governed *only* by the federal rules as amended by our courts, so on its face it leaves room for the Council to supplement those rules, at least where its enactments do not directly conflict with them. *See Woodroof*, 147 A.3d at 784 ("[T]he Council's actions [can]not run directly contrary to the terms of Title 11.").

The appellants never explained how the Anti-SLAPP Act prevents the Superior Court from "conduct[ing] its business according to the Federal Rules of

---

[9] This court has held that we "may refuse to adhere strictly to the plain wording of a statute in order 'to effectuate the legislative purpose,' *Mulky v. United States*, 451 A.2d 855, 857 (D.C. 1982), as determined by a reading of the legislative history or by an examination of the statute as a whole." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C. 1983) (en banc). While we do not think Section 1-206.02(a)(4)'s text plainly favors the appellants' interpretation, even if we concluded otherwise, that interpretation would nonetheless be so clearly contrary to both the legislative purpose behind that provision in particular and the overall purposes animating the Home Rule Act that we would likely reject it in any event.

Civil Procedure." D.C. Code § 11-946. The Superior Court still conducts its business according to the federal rules as modified by our courts in all cases, despite the Anti-SLAPP Act's existence. As the Council puts it in its amicus brief, the Act "does not amend a single word of section 11-946," it does not amend any court rule, nor does it "repeal or otherwise alter the establishment of the Federal Rules . . . as the default rules for the conduct of Superior Court business." *See also Price*, 212 A.3d at 845 (Section 1-206.02(a)(4) should be read "narrowly to mean" only "that the Council is precluded from amending Title 11 itself.").

Our local procedural rules still apply in every single anti-SLAPP case, and our courts retain the authority to modify each of those rules, the Anti-SLAPP Act notwithstanding. Many procedural rules come into play before any special motion to dismiss can be filed. *See, e.g.*, Super. Ct. Civ. R. 4 (requirements for the contents, issuance, and service of a summons); Super. Ct. Civ. R. 8 (pleading requirements). While a special motion to dismiss might end litigation before it gets to the Rule 56 summary judgment stage, that is no novelty—the rules themselves contemplate that. *See* Super. Ct. Civ. R. 12 (motions to dismiss for lack of personal jurisdiction, lack of subject-matter jurisdiction, failure to state a claim, etc.). And in those cases where an anti-SLAPP defendant does not seek or unsuccessfully moves for early dismissal, the full panoply of Rule 56's requirements awaits. *See* Super. Ct. Civ. R. 56. In all cases, therefore, the Superior Court is "conduct[ing] its business" according to the

local rules, and the Anti-SLAPP Act is not a law "with respect to" that in any meaningful sense. D.C. Code §§ 1-206.02(a)(4), 11-946.[10]

The appellants counter that the Anti-SLAPP Act conflicts with our local Rule 56's summary judgment standard, under which full discovery is the norm, while the Anti-SLAPP Act "blocks most if not all discovery" in some cases. This argument starts from the mistaken premise that the Council can in no way alter or affect the procedures in our courts, a premise that misreads the Home Rule Act by evincing far too siloed an approach to the permitted interplay between the Council and our courts. The Home Rule Act does not expressly or implicitly bar the Council from enacting procedural rules that affect court proceedings, and the fact that it protects our own rulemaking authority does not make that authority exclusive—it only precludes the Council from displacing it. *See generally Bergman*, 986 A.2d at 1224-26. It is not as if the Anti-SLAPP Act upends Rule 56 in any way that could be fairly described as preempting it wholesale. The Anti-SLAPP Act and Rule 56 can coexist in perfect harmony. *See Mann*, 150 A.3d at 1238 ("Our interpretation of the requirements and standard applicable to special motions to dismiss ensures that the Anti–SLAPP Act provision is not redundant relative to the rules of civil

---

[10] Even in cases where a special motion to dismiss is granted, plaintiffs have the full benefit of the procedural rules governing post-judgment relief. *See, e.g.*, Super. Ct. Civ. R. 60.

procedure."); *cf. Asylum Co. v. D.C. Dep't of Emp. Servs.*, 10 A.3d 619, 631 (D.C. 2010) ("Courts assume . . . that 'the historic police powers of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress.'" (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992))).

The appellants' response is premised on the mistaken assumption that the Home Rule Act enshrined the substantive/procedural divide policed by federal courts hearing state law claims. That divide not only lacks any textual grounding in the Home Rule Act, its relevance here is minimal, as we now explain.

### B. The Home Rule Act did not enshrine the substantive/procedural divide that governs federal court proceedings

The appellants' position starts with the premise that the Home Rule Act requires this court to police the "substantive law" versus "procedural rule" divide that guides federal courts, per the Supreme Court's seminal decision *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), when adjudicating state law claims. From that mistaken premise, appellants highlight several federal appellate courts—though they are not uniform on the point—that have concluded that the federal rules of procedure prevail over the procedures dictated by state anti-SLAPP laws when federal courts adjudicate state anti-SLAPP suits. *See, e.g.*, *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1333-34 (D.C. Cir. 2015); *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d

231, 238-39 (D.C. Cir. 2021); *La Liberte v. Reid*, 966 F.3d 79, 87-88 (2d Cir. 2020).[11] These federal cases are inapposite for two important reasons.

First, these cases are rooted in federalism and uniformity concerns that have no bearing here; they seek to ensure "a uniform and consistent system of rules" in the federal courts, *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 5 (1987), rather than miring federal courts in the niceties of each states' varied procedural rules. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) ("[D]ivergence from state law . . . is the inevitable (indeed, one might say the intended) result of a uniform system of federal procedure."). Those concerns are absent here. The Anti-SLAPP Act applies uniformly in the District's courts, and there is no vertical power struggle with the federal government at play, only the horizontal separation of powers concern of whether the Council needs this court's approval to enact its limited discovery provisions. So, unlike the federal courts, we have no cause to strictly police the substantive law/procedural rule divide that steers federal court procedures under *Erie*. That doctrine is inapposite here, and nothing

---

[11] One federal circuit has concluded that a state's anti-SLAPP law "has not created a substitute to the Federal Rules, but instead created a supplemental and substantive rule to provide added protections, beyond those in Rules 12 and 56, to defendants who are named as parties because of constitutional petitioning activities." *Godin v. Schencks*, 629 F.3d 79, 88 (1st Cir. 2010). We pay that case no more mind than those that reach a different conclusion—they are all addressed to federalism concerns not present here.

in the Home Rule Act suggests we should import it into our local courts tasked with adjudicating local law.

Second, these federal cases involve a crucially different question from the one presented here. The federal cases, which jealously guard the interests described in the previous paragraph under *Erie*, ask whether a state's anti-SLAPP law "answers the same question" as a provision of the federal rules. *La Liberte*, 966 F.3d at 87 (citing *Shady Grove*, 559 U.S. at 398-99). If so, federal procedure generally governs the federal court proceedings. We confront a fundamentally different question here, which is whether the Anti-SLAPP Act impermissibly interferes with the Superior Court's ability to "conduct its business" according to the federal rules as amended by this court. D.C. Code §§ 1-206.02(a)(4), 11-946. That inquiry is far less concerned with the Anti-SLAPP Act's relationship with one or two discrete procedural rules and instead focuses on whether the Anti-SLAPP Act has affected the Superior Court's operations as a whole. These federal cases are accordingly of little relevance, and appellants' reliance on them was misplaced.[12]

---

[12] There is also the distinction that, even if the procedural provisions of a given state's anti-SLAPP law do not bind federal courts, those laws remain applicable in state court proceedings. Here, appellants ask us to strike down the District's Anti-SLAPP Act provisions even in the District's courts, rendering them a nullity everywhere. That is a more sweeping result that none of the federal authorities had to grapple with.

*C. Appellants' position would thrust the District's courts into a policymaking role that they are fundamentally ill-suited for*

Perhaps most troublingly, the appellants' view boils down to the startling proposition that it is up to *the courts* or Congress to decide whether to enact the Anti-SLAPP Act's discovery-limiting provisions. That would be unwelcome news.

The District's courts generally are not entrusted with, or particularly adept at, making such policy decisions. Because our judges are appointed rather than elected, we are in a poor position to "balanc[e]" the many "costs and benefits" that underlie big-picture decisions about access to the litigation process. *See Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2239 (2025). Those decisions are better made by elected Councilmembers; they are in more direct communication with District residents, who likely experience those costs and benefits in a variety of ways. What do we, an unelected group of judges, think about the substance of the Anti-SLAPP Act's discovery-limiting provisions? We think that raises a policy question outside our bailiwick, so that we ought to get out of the Council's way to do what it does and make such policy judgments. *See supra* n.5.

Several state appellate courts have cogently explained, similarly, that their own anti-SLAPP laws "predominantly further public policy objectives" and thus do not interfere with the judiciary's procedural rules or functions. *Mellowitz*, 221

N.E.3d at 1221; *see also, e.g.*, *Robinson v. V.D.*, 328 A.3d 198, 223-24 (Conn. App. Ct. 2024); *Davis v. Parks*, No. 61150, 2014 WL 1677659, at *2 (Nev. Apr. 23, 2014) (unpublished).  As we have already explained, no state court has ruled otherwise and deprived its own legislature of the power to pass similar anti-SLAPP legislation, which by itself is a pretty devastating blow to appellants' interpretation of the Home Rule Act.  *See Sullivan*, 436 A.2d at 366 (rejecting Home Rule Act challenge out of hand where "[a]cceptance of this argument would be to hold the Council powerless to act in many areas which have traditionally fallen within the local regulatory domain" (quoting *McIntosh v. Washington*, 395 A.2d 744, 751 (D.C. 1978))).

While Congress itself could still pass the Anti-SLAPP Act under the appellants' reasoning, Congress is demonstrably unconcerned with our courts' local procedural rules.  That is no swipe at Congress; it has better things to do.  And Congress made its indifference to our local procedural rules readily apparent in the Court Reorganization Act, when it said—to paraphrase—"take these federal rules of procedure as a starting point, but feel free to supplement or modify them as you wish."  *See* D.C. Code § 11-946.  For appellants to read that law to preclude the Council from so much as affecting our courts' procedures, despite the fact that the Council did not exist at the time of the Court Reorganization Act so Congress had not contemplated any limitation on it, turns that indifference on its head.

Moving beyond the Anti-SLAPP Act itself, there are many District statutes that affect discovery just as much as the Anti-SLAPP Act does, and appellants' reasoning would leave it to our courts to decide whether to give force to those laws by way of rules amendments. Aside from the numerous immunity statutes already discussed, a handful of statutes allow for stays of discovery that are unquestionably procedural, despite the fact that the District's courts have never affirmatively adopted them. *See, e.g.*, Medical Malpractice Amendment Act of 2006, D.C. Code § 16-2821 ("After an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery."); False Claims Act, *id.* § 2-381.03(g)(1) ("[U]pon a showing by the District that certain actions of discovery by the qui tam plaintiff would interfere with the investigation or prosecution of a criminal or civil matter by the District or a criminal matter in the District of Columbia arising out of the same facts, the court may stay such discovery"); Uniform Business Organization Code, *id.* § 29-709.06 (where a limited partnership is named as party in a derivative proceeding, "[i]f the partnership appoints a special litigation committee [to investigate], on motion by the committee made in the name of the partnership, except for good cause shown, the Superior Court shall stay discovery for the time reasonably necessary to permit the committee to complete its investigation."). By appellants' reasoning, it would be up

to our courts to decide which of those statutes to approve and reject, guided by what would surely be policy considerations.

Other statutes control the scope of discovery in more limited ways, similar to how the Anti-SLAPP Act asks courts to determine if targeted discovery is necessary at the special motion to dismiss stage. *See, e.g.*, *id.* § 22-4135(e)(4) (where a person convicted of a crime moves to vacate their conviction for actual innocence, they "shall be entitled to invoke the processes of discovery available under Superior Court Rules of Criminal Procedure or Civil Procedure . . . if, and to the extent that, the judge, in the exercise of the judge's discretion and for good cause shown, grants leave to do so, but not otherwise"). And yet another category of statutes limits what types of information can be discovered, with no grounding in our procedural rules. *See, e.g.*, *id.* § 44-805(a)(1) (certain records of peer review bodies "shall be neither discoverable nor admissible into evidence in any civil, criminal, legislative, or administrative proceeding"); *id.* § 16-4203(a) (mediation communications are privileged and "not subject to discovery or admissible in evidence"); D.C. Code § 14-306(a) (codifying the spousal privilege and directing that one cannot be "compell[ed] to testify for or against their spouse or domestic partner"); D.C. Code § 14-309 (codifying the clergy-penitent privilege and explaining that clergy members "may not be examined in any civil or criminal proceedings" on a variety of topics). If the Anti-SLAPP Act's discovery-limiting provision exceeds the

Council's authority, so too must all of these, unless the courts step in to authorize them.

Then there are the practical concerns with the District's courts having to greenlight any legislation that incidentally affects our courts' procedures. This court has many exemplary qualities, but our "wheels of justice sometimes grind very slowly indeed." *Belcon Inc. v. D.C. Water & Sewer Auth.*, 826 A.2d 380, 383 (D.C. 2003). That careful deliberateness is often a feature of the judiciary. *See Remarks of Justice Alito*, 58 Cath. U. L. Rev. 1, 6 (2008) (describing how "[t]urtles figure prominently in the ornamentation of the Supreme Court building" and are often interpreted to "represent[] the slow and steady pace of justice"). But if we inject ourselves into the policymaking process, it would become a significant flaw.

*    *    *

The Home Rule Act is vital legislation that granted self-governance to the District. The Anti-SLAPP Act, passed by the D.C. Council per its lawmaking authority under the Home Rule Act, ensures that the District's residents can speak their minds about public issues without being dragged into protracted and baseless retaliatory litigation. The Anti-SLAPP Act does not run afoul of the Home Rule Act by impermissibly intruding into Title 11 because it does not alter the structure or jurisdiction of the District's courts; it does not divest us of our rulemaking authority;

it does not run directly contrary to Title 11; and it does not bring about any other drastic alterations to our judiciary, or seek to micromanage our courts' procedures, in any way that Congress sought to preclude the Council from doing when it passed the Home Rule Act. The Anti-SLAPP Act does not unduly infringe on the District's courts' power or assume our area of expertise, nor does it change the fact that the Superior Court conducts its business pursuant to the Federal Rules of Civil Procedure except as modified by our courts. We thus conclude that the Anti-SLAPP Act comports with the Home Rule Act.

Appellants raise several other challenges to the trial court's ruling, and we return the case to the division for it to address those matters in light of this opinion.

*So ordered.*